2015v01677/PWG/ja

**PAUL J. FISHMAN**
**United States Attorney**
**By: PETER W. GAETA**
**Assistant United States Attorney**
**970 Broad Street, Suite 700**
**Newark, New Jersey 07102**
**Tel: 973.645.2927**
**Fax: 973.297.2042**
**peter.gaeta@usdoj.gov.**

**UNITED STATE DISTRICT COURT**
**DISTRICT OF NEW JERSEY**

| | | |
|---|---|---|
| **UNITED STATES OF AMERICA,** | : | **Hon.** |
| **Plaintiff,** | : | **Civil Action No. 15-** |
| **- v. -** | : | **VERIFIED COMPLAINT FOR FORFEITURE *IN REM*** |
| **$1,879,991.64 PREVIOUSLY CONTAINED IN SBERBANK OF RUSSIA'S INTERBANK OR CORRESPONDENT BANK ACCOUNT NUMBERS 0004403077 AND 0004169401, HELD AT DEUSTCHE BANK TRUST COMPANY AMERICAS.** | : | |
| **Defendant *in rem.*** | : | |

Plaintiff, United States of America, by its attorney, Paul J. Fishman, United States Attorney for the District of New Jersey, (by Peter W. Gaeta, Assistant United States Attorney), brings this Verified Complaint and alleges as follows in accordance with Supplemental Rule G(2) of the Federal Rules of Civil Procedure.

**NATURE OF THE ACTION**

1. This is an action to forfeit and condemn to the use and benefit of the United States of America, $1,879,991.64 previously contained in Sberbank of Russia's interbank or correspondent bank account numbers 0004403077 and 0004169401, held at Deustche Bank Trust Company Americas. The United States of America brings this action to enforce the provisions of Title 18, United States Code, Section 981, *et seq.*, which provides for the forfeiture of any property, real or personal, involved in a transaction or attempted transaction in violation of Title 18, United States Code, Sections 1956 and/or 1957.

**THE DEFENDANT IN REM**

2. The defendant property consists of $1,879,991.64 previously contained in Sberbank of Russia's interbank or correspondent bank account numbers 0004403077 and 0004169401, held at Deustche Bank Trust Company Americas. ("defendant property"), which the Federal Bureau of Investigation ("FBI") seized on or about June 26, 2014 from Sberbank of Russia's interbank or correspondent bank account numbers 0004403077 and 0004169401, held at Deustche Bank Trust Company Americas. The defendant property is currently in the custody of the United States.

**JURISDICTION AND VENUE**

3. This Court has jurisdiction over this action pursuant to Title 28, United States Code, Sections 1345 and 1355(a).

4. This Court has *in rem* jurisdiction over the defendant property under Title 28, United States Code, Section 1355(b)(1), because the acts or omissions giving rise to this forfeiture took place in the District of New Jersey. Upon the filing of this Verified Complaint for Forfeiture *In Rem*, the Plaintiff requests that the Clerk of the Court issue a Warrant of Arrest *In Rem* pursuant to Supplemental Rule G(3)(b)(i), which the plaintiff will execute upon the defendant property pursuant to Title 28, United States Code, Section 1355(d) and Supplemental Rule G(3)(c).

5. Pursuant to Title 28, United States Code, Section 1395 this Court is the proper venue for this action because the defendant property is located within the District of New Jersey.

**BASIS FOR FORFEITURE**

6. The defendant property is subject to forfeiture pursuant to Title 18, United States Code, Section 981, et seq., which provides for the forfeiture of any property, real or personal, involved in a transaction or attempted transaction in violation of Title 18, United States Code, Sections 1956 and/or 1957.

7. The defendant property was deposited into bank accounts at Sberbank of Russia which has correspondent accounts in the United States, and pursuant to Title 18, United States Code, Section 981(k)(1)(A), if funds subject to forfeiture are deposited into an account at a foreign bank, and that foreign bank has an interbank account in the United States with a covered financial institution (as defined in Title 31, United States Code, Section

5318(j)(1)), the funds subject to forfeiture shall be deemed to have been deposited into that foreign bank's interbank account in the United States. Moreover, any restraining order, seizure warrant, or warrant for arrest *in rem* regarding the funds may be served on the covered financial institution and the funds in the interbank account, up to the value of the funds held in the account at the foreign bank, may be restrained, seized or arrested.

8. Further, if the forfeiture action is brought against funds pursuant to Title 18, United States Code, Section 981(k)(1)(A), it is not necessary for the United States to establish that the funds are traceable to the funds that were deposited into the foreign bank, nor is it necessary for the United States to rely on the application of Title 18, United States Code, Section 984.

**FACTS**

9. From in or about January of 2008 through 2014, the Federal Bureau of Investigation (FBI), the Department of Homeland Security (DHS) and the Department of Commerce (DOC) conducted an investigation of Alexander Brazhnikov, Jr. a/k/a "Alexandre Brajnikov" ("Brazhnikov, Jr."), Alexander Brazhnikov, Sr. Emil Ayvazyan, Robert Bagdasaryan, and others, for the commission of unlawful activities in the District of New Jersey, and elsewhere, including, the unlicensed exportation of restricted items in violation of federal laws, the smuggling of goods, failure to file Shipper's Export Declaration ("SED") forms, conducting unlawful transactions utilizing overseas funds transmitted into the United States for the purpose of promoting or carrying out

said activities, wire fraud and making false statements to conceal ongoing criminal activities and to impede a criminal investigation.

10. In order to conduct these offenses, Brazhnikov, Jr. and others developed a sophisticated financial network to fund his New Jersey export businesses. Brazhnikov, Jr. owned, operated or controlled the activities of four New Jersey export businesses: a) ABN Universal, Inc., b) Electronics Consulting, c) Telecom Multipliers, Inc. and d) Zond-R, Inc.

11. The overt purpose or function of the Brazhnikov, Jr.'s export businesses was to purchase large quantities of electronic components, electronic parts and related items in the United States from authorized manufacturers or distributors. These items were repackaged at Brazhnikov, Jr.'s business locations and sent to destinations in Russia after failing to submit any documentation to any federal agency on these shipments.

12. However, investigation revealed that the covert purpose of the Brazhnikov, Jr. export businesses was to purchase electronic components, electronic parts and related items that were restricted or prohibited from export from the United States because the component or part itself was restricted or because the end user in Russia was prohibited from receiving the component or part. An export business is required to obtain a license to export these restrict parts or ship parts to a restricted end user.

13. During its investigation, the FBI identified a minimum of fourteen known entities that were authorized and/or licensed contractors for the Russian Military and intelligence services that were involved with Brazhnikov,

Jr.'s illegal export operation. All fourteen entities were prohibited end users and were thus prohibited from receiving electronic parts from Brazhnikov, Jr.'s export businesses. Not only were the fourteen businesses prohibited end users, some of these businesses also received restricted electronic parts.

14. Investigation revealed that Brazhnikov, Jr. also opened, operated or controlled multiple business bank accounts in New Jersey for the above four export businesses and he used one personal account in his name to conduct export business activities.

15. Brazhnikov, Jr. and his export businesses did not conduct sales of electronic components, electronic parts or any other items in the United States and therefore did not generate any income from domestic sales. According to shipping records, all electronic parts or components shipped by Brazhnikov, Jr. and his export businesses had destinations to individuals or businesses in Russia.

16. Investigation revealed that the majority of the electronic components, electronic parts and related items were shipped to an individual identified as Alexander Komarov (Komarov) in Moscow, Russia or to one of Komarov's seven businesses located in the Moscow area.

17. An FBI analysis of Brazhnikov, Jr. bank records did not identify any deposits to the Brazhnikov accounts from Komarov or any of his businesses located in Russia.

18. A review of Brazhnikov, Jr's. export business accounts revealed that they were primarily funded by large wire transfers from approximately 50

foreign "shell" companies located in many countries including, the British Virgin Islands, Latvia, Marshal Islands, Panama, Ireland, England, United Arab Emirates, Russia and Belize.

19. According to the FBI analysis, from or about July, 2010 to April, 2014, Brazhnikov, Jr.'s export business accounts received wire transfers of approximately $65,000,000 from the foreign "shell"[1] companies. The "shell" companies appear to be the source of deposit into Brazhnikov's export business accounts in New Jersey however investigation revealed that the actual source of the funds were businesses in Russia.

20. Investigation revealed that large wire transfers were sent from ABN Universal, Inc.'s TD Bank account to two personal bank accounts of Alexander Brazhnikov at the Sberbank of Russia located in Moscow. This ABN Universal account was an account that received direct funding from the "shell" companies.

21. Specifically,

a) $1,360,000 in wire transfers were sent from the ABN Universal, Inc. account to Alexander Brazhnikov's account number, 40817840238170001045, at the Sberbank in Russia. Brazhnikov's address for this account was 1st Goncharny Pereulok 7, Apartment 53, Moscow, Russia.

b) $20,000 in wire transfers were sent from the ABN Universal, Inc. account to Brazhnikov's account number, 40817840238177600012, at the

---

[1] A "shell" company is a business which serves as a vehicle for business or financial transactions without itself having any significant assets or operations. "Shell" companies are frequently used by money laundering organizations to hide, disguise or conceal the true source of the monies involved in a transaction.

Sberbank in Russia. Brazhnikov's address for this account was 21 B Bolshaya Nikitskaya Street, Apartment 52, Moscow, Russia.

c) $500,000 in wire transfers were sent from the Zond-R Inc. account at Chase Bank to Brazhnikov's account number, 42306840338177600010, at the Sberbank in Russia. Brazhnikov's address for this account was B. Akademicheskaya 20B, Apartment 52, Moscow, Russia.

22. Investigation revealed that the Zond-R Inc. account was an account that received direct funding from the "shell" companies.

23. The following chart summarizes the wire transfers of $1,880,000 that were sent to the Sberbank accounts of Brazhnikov:

| **Account Sending the Wire Transfers** | **Account Receiving the Wire Transfers** | **Total Amount Sent** |
|---|---|---|
| ABN Universal, Inc., TD Bank 7862328684 | Alexander Brazhnikov, Sberbank of Russia, 40817840238170001045 | $1,360,000.00 |
| ABN Universal, Inc., TD Bank 7862328684 | Alexander Brazhnikov, Sberbank of Russia, 40817840238177600012 | $20,000.00 |
| Zond-R Inc., Chase Bank 213065695 | Alexander Brazhnikov, Sberbank of Russia, 40817840238177600010 | $500,000.00 |

24. On or about June 26, 2014, the Honorable Mark Falk, United States Magistrate Judge for the District of New Jersey, issued 11 seizure warrants for various bank accounts held in the names of Brazhnikov, Jr. and his export businesses including a seizure warrant for up to a total of $1,880,000 in Sberbank of Russia's interbank or correspondent bank account numbers 0004403077 and 0004169401, held at Deustche Bank Trust

Company Americas which sum reflects the amount deposited into Sberbank account numbers 40817840238170001045, D40817840238177600012 and 42306840338177600010 under the control of Alexander Brazhnikov.

25. On the same date, the FBI executed the above-referenced seizure warrant on Deutsche Bank, and the defendant property was seized.

26 On or about June 26, 2014, a criminal complaint was sworn out in the United States District Court for the District of New Jersey charging Alexander Brazhnikov, Jr. with, inter alia, multiple export violations, and money laundering.

27. On or about June 26, 2014, Brazhnikov, Jr. was arrested by FBI agents at his residence, 234 Central Avenue, Mountainside, New Jersey.

28. On or about June 11, 2015, Brazhnikov, Jr. entered a guilty plea to a three count Information which charged him with a) conspiracy to commit money laundering; b) conspiracy to smuggle goods into the United States; and c) conspiracy to violate the International Emergency Economic Powers Act. *See United States v. Alexander Brazhnikov, Jr.*, 15-300 (WJM)

29. On or about June 11, 2015, Brazhnikov, Jr. pursuant to the plea agreement entered in the related criminal matter and as part of a global resolution of the criminal and civil cases, Brazhnikov agreed to the civil forfeiture of the defendant property as a result of the violations set forth in his plea agreement.

30. During his plea allocution on June 11, 2015, Brazhnikov, Jr. admitted in substance and in part:

a) That from in or around January 2008 through in or about June 2014 he was the owner, chief executive officer and principal operator for the following microelectronics export companies (i) ABN Universal, Inc., (ii) Electronics Consulting, (iii) Telecom Multipliers, Inc. and (iii) Zond-R, Inc. (NJ Export Companies).

b) That from in or around January 2008 through in or about June 2014, Brazhnikov, Jr.'s father, Alexander Brazhnikov, Sr. (Brazhnikov Sr.), was the owner, chief executive officer, and principal operator of a Russian business entity identified as ABN Universal, a microelectronics import/export company located in Moscow, Russia (Moscow Enterprise).

c) That both Brazhnikov, Jr. and Brazhnikov Sr. used the NJ Export Companies and the Moscow Enterprise to facilitate the unlawful acquisition and export of license-controlled electronics components from United States manufacturers and vendors to Russian business entities, including licensed defense contractors.

d) That the Russian defense contracting firms authorized to supply the parts Brazhnikov, Jr. unlawfully obtained for them to, among others, the Ministry of Defense of the Russian Federation, the Federal Security Service of the Russian Federation (hereinafter, the "FSB"), and Russian entities involved in the design of nuclear warheads, as well as nuclear weapons strategic and tactical platforms.

e) As part of the money laundering conspiracy Brazhnikov, Jr. and Brazhnikov Sr. conspired with one another and others in Russia and

elsewhere to establish a banking network designed to facilitate and conceal their financial dealings and illegal procurement activities.

f) As part of that banking network, Brazhnikov, Jr., Brazhnikov Sr. and their co-conspirators established a primary funding and operations account in Russia.

g) In addition to the primary funding and operations account, Brazhnikov, Jr., Brazhnikov Sr., and their co-conspirators also established numerous foreign bank accounts held by shell corporations in the British Virgin Islands, Latvia, Marshall Islands, Panama, Ireland, England, United Arab Emirates, and Belize.

h) Brazhnikov, Jr. established a number of bank accounts in the United States to facilitate his illegal operations, including accounts held in Brazhnikov, Jr.'s name and in the names of the NJ Export Companies.

i) Brazhnikov, Jr and Brazhnikov Sr. facilitated the receipt and deposit of funds from Brazhnikov, Jr.'s Russian customers into his network's primary funding and operations account in Russia.

j) Brazhnikov, Jr. and Brazhnikov Sr. primarily were responsible for directing the transfer of funds used in his illegal procurement operations by and between all of Brazhnikov, Jr's. worldwide bank accounts, including the shell corporation accounts.

k) In furtherance of the money laundering conspiracy approximately $65 million was transferred from locations outside the United States, from Russian sources, and into the United States.

l) Brazhnikov, Jr. admitted that he used these illicit funds from Russian sources to subsequently purchase and illegally export electronic components from the United States.

k) Brazhnikov, Jr. admitted that his network's creation and use of dozens of shell companies was intended to conceal the true sources of funds in Russia, as well as the identities of the various Russian defense contracting firms who were receiving U.S. electronics components.

m) As part of the conspiracy to smuggle electronics components from the U.S., Brazhnikov Sr. and the Moscow Enterprise generally was responsible for obtaining initial requests for quotes for U.S. electronics components from various Russian customers, including licensed defense contractors.

n) Brazhnikov, Jr. and the NJ Export Companies were generally responsible for finalizing the purchase and acquisition of the electronics requested by his Russian customers from the various U.S.-based vendors who could supply those parts.

o) In order to make purchases on behalf of his Russian customers, and to evade U.S. export control laws, Brazhnikov, Jr. and his co-conspirators routinely concealed from U.S. vendors the true identity of the ultimate end-user of the components in Russia.

p) Brazhnikov, Jr. admitted that following his receipt of electronics components from U.S. vendors, he used the NJ Export Companies

to re-package and prepare the parts for export to his co-conspirators in Russia through various shipping companies based in New York and New Jersey.

q) As part of his shipping process, Brazhnikov, Jr. routinely and systematically falsified the true value of the exported items on shipping documents in order to evade the legal requirement of filing an Electronic Export Information ("EEI") form via the Automated Export System ("AES"), thereby concealing the true extent of his export activities from authorities in the United States.

r) That in addition to falsifying the value of the parts that were exported, Brazhnikov, Jr. and his co-conspirators purposefully concealed the true destination of the parts shipped to Russia by directing that the shipments be sent to various false recipients and addresses in Moscow, some of which were vacant apartments or storefronts, that were actually controlled by Brazhnikov Sr. and the Moscow Enterprise.

s) That each of the false addresses in Moscow were shell entities established at the direction of Brazhnikov Sr., and were utilized by Brazhnikov, Jr's. network as part of its illicit procurement of U.S. electronics components.

t) That the use of the recipient shell entities in Moscow enabled him and your co-conspirators to falsify the true Russian end-users of the electronics components you unlawfully obtained and exported from the U.S.

u) As part of the conspiracy to evade the International Emergency Economic Powers Act, Brazhnikov, Jr. and his co-conspirators

purposefully exported electronics components from the United States to Russia knowing that, although licenses were required for such exports, licenses had not been obtained.

v) That Brazhnikov, Jr. and his co-conspirators routinely caused the export of electronics components obtained from United States manufacturers in the U.S. to Russia on behalf of Russian intelligence, military, and nuclear entities for which no export license could have lawfully been obtained.

w) That from approximately January 2008 through in or about June 2014, Brazhnikov, Jr. and his co-conspirators were responsible for over 1,900 shipments of electronics components from the U.S. to Russia, totaling more than $65,000,000 in unlawfully exported goods.

x) That in partial satisfaction of the $65,000,000 forfeiture money judgment, Brazhnikov, Jr. agreed to the forfeiture of $1,879,991.64 seized from Sberbank which shall be forfeited through a related civil forfeiture action, as assets representing property involved in and traceable to the charged offenses against Brazhnikov, Jr.

**FIRST CLAIM FOR FORFEITURE**

31. The allegations contained in paragraphs 1 through 30 of this Verified Complaint for Forfeiture *In Rem* are incorporated herein and made part hereof.

1. Title 18, United States Code , Section 1956, commonly known as the "money laundering" statute, imposes a criminal penalty on any

person who knowing that property involved in a financial transaction represents the proceeds of some form of unlawful activity, conducts or attempts to conduct such a financial transaction which in fact involves the proceeds of specified unlawful activity ---

> (A) (I) with the intent to promote the carrying on of the specified unlawful activity; or ...
>
> (B) knowing that the transaction is designed in whole or in part ---
>
> (C) to conceal or disguise the nature, the location, the source, the ownership, or the control of the proceeds of specified unlawful activity ....

2. The term "financial transaction" means "a transaction ... involving one or more monetary instruments." Title 18, United States Code, Section 1956(c)(4).

3. A "Specified Unlawful Activity" is defined in Title18, United States Code, Section 1956(c)(7), and, by reference, incorporates the offenses listed in Title18, United States Code, Section 1961(1).

4. It is an offense under Section 1956(h) to conspire to commit an offense described in Section 1956 or 1957.

5. By reason of the above, the defendant property became and is, subject to forfeiture to the United States of America pursuant to Title 18, United States Code, Section 981 because there is probable cause to believe that it is property involved in a transaction or attempted transaction in violation of Title 18, United States Code, Section 1956 or represents property traceable to such property.

**SECOND CLAIM FOR FORFEITURE**

32. Incorporated herein and made part hereof are allegations contained in paragraphs 1 through 31 of this Complaint.

1. Title 18, United States Code, Section 1957, also known as a money laundering crime, imposes a criminal penalty on any person or persons who knowingly engage or attempt to engage in a monetary transaction in criminally derived property that is of greater value than $10,000 and is derived from specified unlawful activity.

2. The term "monetary transaction" means the deposit, withdrawal, transfer, or exchange, in or affecting interstate or foreign commerce, or funds or a monetary instrument by, though, or to a financial institution. "Criminally derived property" means any property constituting, or derived from, proceeds obtained from a criminal offense.

3. By reason of the foregoing the defendant property is subject to forfeiture to the United States pursuant to Title 18, United States Code, Section 981 because there is probable cause to believe that it is property involved in a transaction or attempted transaction in violation of Title 18, United States Code, Section 1957 or represents property traceable to such property.

4. It is an offense under Section 1956(h) to conspire to commit an offense described in Section 1956 or 1957.

**WHEREFORE**, the United States of America requests that the Clerk of the Court issue a warrant for the arrest and seizure of the defendant property;

that notice of this action be given to all persons who reasonably appear to be potential claimants to the property; that the defendant property be forfeited and condemned to the United States of America; that the plaintiff be awarded its costs and disbursements in this action; and that the Court grant such other and further relief it deems proper and just.

Dated: August 25, 2015

PAUL J. FISHMAN
United States Attorney

By: PETER W. GAETA
Assistant United States Attorney

## VERIFICATION

**STATE OF NEW JERSEY** :
: **ss**
**COUNTY OF ESSEX** :

I, Chetwyn M. Jones, hereby verify and declare under penalty of perjury that I am a Special Agent with the Federal Bureau of Investigation, that I have read the foregoing Verified Complaint for Forfeiture *In Rem* and know the contents thereof, and that the matters contained in the Verified Complaint are true to my own knowledge, except that, as to those matters herein stated to be alleged on information and belief, I believe them to be true.

The sources of my knowledge and the grounds of my belief include the official files and records of the United States, information supplied to me by other law enforcement officers, and my own investigation of this case.

I hereby verify and declare under penalty of perjury that the foregoing is true and correct.

Chetwyn M. Jones
Special Agent
Federal Bureau of Investigation

Sworn to and subscribed before me this
21 day of August, 2015, at Newark, New Jersey.

PETER W. GAETA
Attorney-at-Law of the State of New Jersey